FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

13 APR 16 PM 6: 01

OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 8:13CR 146 |
| | ) | |
| Plaintiff, | ) | INDICTMENT |
| | ) | |
| v. | ) | 18 U.S.C. § 371 |
| | ) | 18 U.S.C. § 1341 |
| JONATHAN W. ARRINGTON, | ) | 18 U.S.C. § 1343 |
| MICHAEL B. KRATVILLE, | ) | 18 U.S.C. § 2 |
| MICHAEL J. WELKE, | ) | |
| | ) | |
| Defendants. | ) | |

The Grand Jury charges:

## INTRODUCTION

At all times material to this Indictment:

1.     Defendant, JONATHAN W. ARRINGTON, a resident of Omaha, Nebraska, was the President of Elite Management Holdings Corp. (EMHC), as well as President of MJM Enterprises LLC, (MJM) with their principal place of business in Omaha, Nebraska.

2.     Defendant, MICHAEL B. KRATVILLE, a resident of Omaha, Nebraska, was an attorney at law licensed to practice in the State of Nebraska.  KRATVILLE was an equal owner and Secretary and Treasurer of EMHC and Vice President of MJM.

3.     Defendant, MICHAEL WELKE, a resident of Omaha, Nebraska, was an equal owner and Vice President of EMHC and Vice President of MJM.

4.     EMHC, as general partner, and through, and in conjunction with, its companion limited partnerships, Elite Aggressive Growth Group, LP (EAGG), EMIF, LP and Elite Index Investment Group LP (EIIG) (hereinafter collectively called "Elite"), were engaged in the business of providing an investment vehicle whereby individuals could collectively invest in

commodities, precious metals and currency markets. Most all of the investors resided in the State of Nebraska.

5.      According to Elite's promotional material, Elite's business purpose was to provide investment groups and individual investors with the opportunity to join one of Elite's limited partnerships to invest money in a "non-traditional way." Elite was to make all decisions regarding funds received. According to this setup, the risk would be reduced and the opportunity greater for potentially larger returns.

6.      A significant part of Elite's investment program was their return on investment feature. An investor's return on investment was capped based on the amount of funds the investor placed with Elite. For example, if one invested $10,000-25,000, his return on investment would be capped at 4 percent monthly. If his investment was between $25,000-50,000, his investment would be capped at 5 percent monthly. If there was an investment greater than $50,000, the monthly return would be capped at 6 percent. The capped percentages changed during the program.

7.      Another significant aspect of the Elite investment program that was pitched to would-be investors was the promise that no more than 10 percent of principal was invested at any one time, thus, minimizing the risk of significant losses to their investment.

8.      NIC LLC (NIC) and MJM Enterprises LLC (MJM), both Wyoming corporations, were formed in May, 2006, by Defendant, JONATHAN W. ARRINGTON. The formation of NIC and MJM was a direct result of the Nebraska Department of Banking and Finance ordering the Defendants to cease Elite's operations in Nebraska and return all funds to their investors. NIC and MJM were formed by the Defendants to replace the Elite program. MJM was the

2

controlling LLC that managed NIC. Defendants, ARRINGTON, KRATVILLE and WELKE, shared equal ownership and control of MJM.

9.     FX Investment Group (FXIG) was owned and operated by F.H., an American citizen, living and operating FXIG from Madrid, Spain. The Defendants, d/b/a Elite and NIC, provided pooled investment funds to F.H. and other traders, including Sonador, based in Phoenix, Arizona, as well as J.S. and D.P.

## COUNT I
## CONSPIRACY
## (18 U.S.C. § 371)

10.     The Grand Jury alleges and incorporates as fully set forth herein Paragraphs 1-9 of this Indictment.

## THE CONSPIRACY AND ITS OBJECTS

11.     Beginning on or about July, 2005, and continuing to on or about December 31, 2008, in the District of Nebraska and elsewhere, the Defendants, JONATHAN W. ARRINGTON, MICHAEL B. KRATVILLE and MICHAEL J. WELKE, knowingly and unlawfully combined, conspired, confederated, and agreed to commit one or more of the following offenses against the United States:

(a)     To devise a scheme and artifice to defraud prospective investors and investors in the Elite and NIC investment programs of money and to obtain money by means of false and fraudulent pretenses, representations and promises and to utilize and cause to be utilized the United States mail for the purpose of executing that scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1341.

3

(b)     To devise a scheme and artifice to defraud prospective investors and investors in the Elite and NIC investment programs of money and to obtain money by means of false and fraudulent pretenses, representations and promises and to utilize wire communications in interstate and foreign commerce for the purpose of executing that scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

## OBJECTS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

12.     The objects of the conspiracy and scheme to defraud were to:

(a)     Establish entities and an organizational structure that solicited and invested funds of victim investors;

(b)     Mislead the investing victims through false and fraudulent representations;

(c)     Misrepresent the purported earnings of the investments to the victims;

(d)     Fail to advise the victims that their funds were in jeopardy of being lost, or in fact, had been lost, which was done to continue the fraud, entice additional investments and secure new victim investors;

(e)     To profit financially from their fraudulent misrepresentations; and

(f)     Conceal and cover up their actual degrees of participation in the scheme.

## MANNER AND MEANS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

13.     Some of the manner and means employed by the conspirators to carry out the conspiracy and to effect the unlawful objects of the conspiracy were the following:

(a)     During the summer of 2005, the Defendants, d/b/a Elite, began soliciting prospective investors to provide funds to invest. As part of their solicitations, both orally and in written marketing materials, the Defendants emphasized their exceptional expertise and

4

successful track record, as well as their ability to limit financial risk, while at the same time

delivering significant returns on investment.

      (b)     A significant feature and selling point of the Elite investment program was the

significant monthly returns on investments which were structured based on the amount of funds

invested.  If one invested between $10,000 and $25,000, his return would be capped at 4 percent

per month. An investment of $25,000-$50,000 would have a cap return of 5 percent per month,

and any investment greater than $50,000 would be capped at 6 percent per month.  Most all of

the solicitations made by the Defendants to the investors and prospective investors emphasized

that Elite, and later NIC, had met their target returns each and every month beginning in

approximately 2002.

      (c)     Investors in the Elite program would receive a monthly newsletter, as well as

have access to an Elite, and later NIC, website to check on their individual investment accounts

and follow the monthly returns of their investments.

      (d)     Other features of the Elite/NIC programs, as represented by the Defendants

to the investors through their sales pitches and written marketing materials, which were geared to

putting their investors in a financial comfort zone, included the following:

           (1)     That the risk of loss of their investment was significantly reduced, in that

according to the Defendants' marketing pitch, only 10 percent of an investor's principal would be

invested at any one time;

           (2)     That their investments took place domestically within the United States

and would be handled by reputable traders and brokers here in the United States;

5

(3)     That the owners of Elite/NIC, would incur all operating expenses and that the Elite/NIC principals would not be compensated unless and until the investors received their target returns.  Any amounts realized above the capped return amounts would act as compensation for the Defendants' services.

(e)     In the summer of 2006, the Nebraska Department of Banking and Finance (NDBF), after receiving information related to Elite's investment program, and after conducting an investigation, ordered Elite to cease their investment program as it existed and return all funds to the investors.  The NDBF, based on representations made by the Defendants, believed that the Defendants complied with their shutdown directive.

(f)     In truth and in fact, the Defendants replaced Elite with a new corporate structure, specifically NIC and MJM, which were Wyoming corporations.  Similar to the Elite entities, NIC was the investment pool and MJM was the controlling member that managed NIC.  The Defendants were equal owners of MJM and assumed complete control of NIC.  NBDF knew nothing about NIC or MJM.

14.     It was part of the conspiracy that the Defendants induced approximately 100 investors to invest approximately $4,000,000 with Elite/NIC, by making and causing others to make, material false and fraudulent representations and promises concerning, among other things:

(a)     their extensive skills and experience in trading futures, market analysis and successful investment strategies related to the trades;

(b)     the successful, historical performance of their futures and forex trading strategies;

(c)     the risk involved in the investment;

6

(d)    the use of the funds obtained from the investors; and

(e)    the actual monthly returns on their investments.

15.    It was further part of the conspiracy that the Defendants falsely represented that

Elite, through their "Senior Trader," Defendant JONATHAN W. ARRINGTON, was doing all

the trades involving their investment monies, when in truth and in fact, as the Defendants well

knew, the actual Elite trades were not being done by Defendant, JONATHAN W. ARRINGTON,

but rather, by F.H., owner of FXIG, based in Madrid, Spain.

16.    It was further part of the conspiracy that the Defendants, JONATHAN W.

ARRINGTON, MICHAEL B. KRATVILLE and MICHAEL J. WELKE, represented in their

written solicitation and marketing materials that their investment program was so highly touted

because of its financial success, that several multi-million offers were made to purchase the Elite

system. In truth and in fact, as the Defendants well knew, there had been no offers to purchase

the Elite investment system, because there was no proprietary trading program to sell.

17.    It was further part of the conspiracy that from late 2005 through 2007, the

Defendants represented to their investors and prospective investors that Elite/NIC had met its

monthly target returns each and every year for several years, when in truth and in fact, as the

Defendants well knew, the earliest Elite investor in the Defendants' newly established investment

program wasn't solicited until late summer of 2005.

18.    It was further part of the conspiracy that the Defendants represented that they

would not be compensated unless the investors received their target returns. Any returns in

excess of that amount would be their compensation. In truth and in fact, the Defendants did

invade the investment pool money when purported returns didn't reach capped levels extracting cash from Elite's/NIC's bank accounts.

19.    It was further part of the conspiracy that the Defendants advised their investors and prospective investors that there was little risk in investing in Elite/NIC, because only 10 percent of their funds would be invested at any one time, when in truth and in fact, as the Defendants well knew, that the Defendants had no control over what percentage of funds were being traded.

20.    It was further part of the conspiracy that as of the fall of 2005, Defendant, JONATHAN W. ARRINGTON, advised some of the investors and prospective investors that Elite met the maximum monthly target return of 6% for at least 42 consecutive months, when in truth and in fact, as the Defendant, JONATHAN W. ARRINGTON, well knew, such advisement was false.

21.    It was further part of the conspiracy that the Defendant, MICHAEL J. WELKE, in October 2005, acted as a reference to prospective investors, representing himself as a satisfied client of and investor in Elite, rather than acknowledging his ownership interest in Elite.

22.    It was further part of the conspiracy that Defendant, MICHAELB. KRATVILLE, advised one prospective investor, among other things, that he, MICHAEL B. KRATVILLE:

(a)    developed and tested the trading program that Elite used;

(b)    that the program had been making target returns of 6 percent annually for the past 40 months as of April, 2006;

(c)    that he refused several offers to sell the program because the program was making so much money;

8

(d)     that he was friends with Warren Buffett, and that Mr. Buffett's children were investors in the Elite program;

In truth and in fact, as Defendant, MICHAEL B. KRATVILLE, then and there well knew, all of these advisements were false.

23.     It was further part of the conspiracy that the Defendants represented to the investors and prospective clients that the individuals could withdraw their money at any time, when in truth and in fact, ultimately, they were not able, in most cases to withdraw their funds from the Elite program.

## THE ENDING OF ELITE, THE BEGINNING OF NIC

24.     In late-May 2006, after being in business as Elite since late summer 2005, the Defendants received notification from the Nebraska Department of Banking and Finance (NDBF) that the Elite  investment program might be in violation of state law and ordered them to cease operations.

## THE SCHEME CONTINUES

25.     It was further part of the conspiracy that Defendants, MICHAEL B. KRATVILLE and MICHAEL J. WELKE, in response to the NDBF directive, advised the NDBF, via letter and in person, that Elite would make no further offers of sale of investments, and that Elite would be returning all invested funds to the Elite investors at the direction of the NDBF.  In truth and in fact, as the Defendants well knew, the investment funds were not returned to the Elite investors in most instances, but rather, rolled over into the newly created corporate entities NIC  and MJM.

26.     It was further part of the conspiracy that the Defendants did not advise their Elite investors that the NDBF had ordered them to shut down their Elite operation and return all funds to their investors, but rather advised them that there had been a name change of the program.

27.     It was further part of the conspiracy that the Defendants never told NDBF of this ploy, leading the NDBF to believe that the Defendants were following their directive and ceasing operations.

28.     It was further part of the conspiracy that during the period of approximately July 2006 through September 2007, the Defendants made substantially the same representations to NIC Investors as they did under the Elite program, these representations included:

(a)     that the investment funds that NIC managed and controlled were very profitable and had met or exceeded their target return numbers for many years.

(b)     that no more than 10% of an investor's principal was at risk at any one time.  Both of these representations were false.

29.     It was further a part of the conspiracy that the Defendant, JONATHAN W. ARRINGTON, represented to some of the prospective investors and investors in the NIC program the following:

(a)     that he developed the trading program employed by NIC;

(b)     that he was offered several millions of dollars to sell the NIC proprietary trading program;

(c)     that the program never lost money; and

(d)     that as of March 2007, NIC employed nine of the top ten traders in the world. All of these representations were false.

30.     On or about October 2006, FXIG, which held the majority of Elite/NIC funds at that time, stopped reporting monthly return information.

10

31.     As part of the conspiracy, the Defendants, however, continued reporting positive monthly return numbers, when in fact, the Defendants well knew they were not receiving performance information from FXIG on which to base their positive return numbers which were given to their investors.

32.     On or about early 2007 Defendants learned that funds placed with FXIG suffered a significant loss. As part of the scheme and artifice to defraud the Defendants failed to report these losses to the Elite/NIC Investors.

33.     It was further part of the conspiracy that the Defendants reported false return amounts and continued to report false return amounts well after they suspected or knew that the majority of monies placed with FXIG had been lost.

34.     It was further part of the conspiracy that the Defendants failed to accurately report monthly return information of the other traders, including Sonador, J.S., and D.P.

35.     It was further part of the conspiracy that on or about June 2006, Defendants, KRATVILLE and WELKE, upon realizing the majority of the Elite/NIC funds were lost and unrecoverable, purportedly resigned from Elite as evidenced by signed resignation letters prepared and signed by the Defendants on or about August, 2007, but backdated by the Defendants to create the appearance that MICHAEL KRATVILLE and MICHAEL WELKE, as of June 23, 2006, had nothing to do with Elite/NIC from then on. In truth and in fact, Defendants KRATVILLE and WELKE, in varying degrees and capacities, remained active in the management and control of NIC from 2006 forward, the backdating of the resignation letters being a ploy to distance themselves from their further participation in the scheme.

11

**VICTIM LOSS**

36.     As a result of the aforementioned conspiracy, the Defendants caused

approximately 100 victims who provided funds for investment in the Elite and NIC programs to

suffer losses totaling approximately $4,000,000.

**OVERT ACTS**

37.     In furtherance of the conspiracy and in order to effect the objects thereof, the

Defendants, JONATHAN W. ARRINGTON, MICHAEL B. KRATVILLE and MICHAEL J.

WELKE, committed and caused to committed the following overt acts, among others, in the

District of Nebraska and elsewhere:

(a)     On or about November 7, 2005, Defendant, MICHAEL J. WELKE, sent Victim

L.W. an email which included information that Elite had met its target goal of 6 percent for the

42nd consecutive month.

(b)     On or about April 2006, Defendant MICHAEL J. WELKE received a distribution

of $100,000 from the Elite bank accounts.

(c)     On or about May 25, 2006, NIC, LLC and MJM Enterprises, LLC, were

incorporated as a limited liability corporation in the State of Wyoming by Defendant,

JONATHAN W. ARRINGTON.

(d)     On or about May 26, 2006, the Defendant, MICHAEL B. KRATVILLE, authored

and sent a letter to the Nebraska Department of Banking and Finance advising, among other

things, that Elite would discontinue the sale of their Elite investment program.

12

(e)     On or about August 2006, the Defendant, JONATHAN W. ARRINGTON, met with victim D.U. for the purposes of explaining and promoting the NIC investment program which ultimately led to a substantial investment in the program by D.U.

(f)     On or about late-August and early September 2006, the Defendant, MICHAEL J. WELKE, solicited Victim B.T. and gave credibility to investing with Defendant JONATHAN W. ARRINGTON and Defendant Michael Kratville, without telling Victim B.T. that he, (Defendant, MICHAEL J. WELKE), was in fact an owner of Elite, and not just a client investor.

(g)     On or about December 2006, Defendant MICHAEL J. WELKE received a distribution of approximately $50,000 from the NIC bank account.

(h)     On or about August 2007, Defendants MICHAEL B. KRATVILLE, MICHAEL J. WELKE, and JONATHAN W. ARRINGTON, signed Defendant Kratville's and Defendant Welke's resignations from NIC and MJM on documents backdated to June 23, 2006.

(i)     On or about the latter part of 2008, Defendant MICHAEL KRATVILLE requested P.S., a friend and client, to use his "contacts" at a local bank to obtain signature cards listing Defendant MICHAEL KRATVILLE as an executive of Elite/NIC.

(j)     On or about December 29, 2008, Defendant MICHAEL KRATVILLE, sent an email to P.S., a friend and client, asking P.S. if P.S. had obtained the signature cards.

In violation of Title 18, United States Code, Sections 371.

### COUNTS II through VII
### MAIL FRAUD, AIDING AND ABETTING
### 18 U.S.C. § 1341 and 2

38.     The Grand Jury re-alleges and incorporates as if fully set forth herein, Paragraphs 1 through 36 of this Indictment and further alleges that such paragraphs describe a scheme and

artifice to defraud and for obtaining money by means of false and fraudulent pretenses, representations and promises.

      39.     On or about the dates listed below in the District of Nebraska and elsewhere, for the purpose of executing and attempting to execute said scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, the Defendants, JONATHAN W. ARRINGTON, MICHAEL B. KRATVILLE and MICHAEL J. WELKE, did knowingly place and caused to be placed in a post office, and authorized depository for mail matter to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited any matter or thing to be sent and delivered by a private or commercial interstate carrier, from, to or within the District of Nebraska, as set forth below, each such instance being a separate Count of this Indictment.

| Count | Date (On or About) | Sender | Addressee | Item Sent |
|---|---|---|---|---|
| II | 12/06/06 | T.P. | NIC LLC and/or John Arrington | $10,000 check |
| III | 12/26/06 | R.L. | NIC LLC and/or John Arrington | $3,000 check |
| IV | 01/04/07 | S.M. | NIC LLC and/or John Arrington | $10,000 check |
| V | 03/23/07 | R.L. | NIC LLC and/or John Arrington | $1,000 check |
| VI | 03/23/07 | Charles Schwab | Jerry Howe | $52,597.53 check |
| VII | 05/20/07 | D.F. | NIC LLC and/or John Arrington | $12,000 check |

     In violation of Title 18, United States Code, Sections 1341 and 2.

14

## COUNTS VIII through XIV
### WIRE FRAUD, AIDING AND ABETTING
### 18 U.S.C. §§ 1343 and 2

40.     The Grand Jury re-alleges and incorporates as if fully set forth herein, Paragraphs 1 through 36 of this Indictment and further alleges that such paragraphs describe a scheme and artifice to defraud and for obtaining money by means of false and fraudulent pretenses, representations and promises.

41.     On or about the dates listed below, in the District of Nebraska and elsewhere, for the purpose of executing said scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, the Defendants, JONATHAN W. ARRINGTON, MICHAEL B. KRATVILLE and MICHAEL J. WELKE, did knowingly transmit and cause to be transmitted, by means of wire and radio communications in interstate commerce, certain writings, pictures, signals and sounds to wit:  interstate electronic bank wires and e-mails to and from the District of Nebraska and elsewhere, as set forth in the chart below, each such instance being a separate Count of this Indictment:

| **Count** | **Victim/Witness** | **Date (On or About)** | **From/To** | **Type of Wire Bank/E-Mail** |
|---|---|---|---|---|
| VIII | T.B. Victim | 11/02/05 | Bank of NY, New York, NY to Wells Fargo Bank, Omaha, NE | $165,201.76 Bank Wire |
| IX | A.L. Victim | 02/02/06 | Bank of NY, New York, NY to Wells Fargo Bank, Omaha, NE | $59,972.50 Bank Wire |
| X | L.D. Victim | 03/09/06 | Bank of NY, New York, NY to Wells Fargo Bank, Omaha, NE | $39,972.81 Bank Wire |
| XI | J.R. Victim | 11/15/06 | Iowa-Nebraska State Bank, S. Sioux City, NE to Liberty Bank, W. DesMoines, IA | $86,711.16 Bank Wire |
| XII | D.U. Victim | 07/30/07 | First National Bank of Omaha, Omaha, NE to Liberty Bank, W. Des Moines, IA | $75,000 Bank Wire |
| XIII | J.L. Victim | 09/21/07 | Centris FCU, Omaha, NE to Liberty Bank, W. DesMoines IA | $50,000 Bank Wire |
| XIV | P.S. Witness | 12/29/08 | Outside State of NE to Bellevue, NE | E-Mail |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL

███████████████████

~~FOREPERSON~~

DEBORAH R. GILG
United States Attorney

The United States of America requests that trial of this case be held in Omaha, Nebraska,

pursuant to the rules of this Court.

RUSSELL X. MAYER
Assistant U.S. Attorney

17